UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**DANIEL EDWARD BROWN,** and
**SHIRLEY ANN BROWN,**

Debtors.

Case No.  **00-12915-7**

**THOMAS E BOLAND,**

Plaintiff,

-vs-

Adv. No.  **06-00138**

**DARCY M. CRUM, JOSEPH V.
WOMACK, RICHARD J. SAMSON,
WILLIAM M. KEBE, JR., ROSS P.
RICHARDSON, GARY S. DESCHENES,
DONALD W. TORGENRUD, JR.,
ROBERT G. DRUMMOND, DANIEL
EDWARD BROWN, SHIRLEY ANN
BROWN, JAMES A PATTEN, SHARON
R PRUITT, EARL D PRUITT, LAURA J
SANDSTROM, CLAYTON J
ARCENEAUX, KENNETH JOHNSON,
BRANDI L.  HAZEN, GAYLE
RIDENOUR, DARREL S.
ARENSMEYER, EDWARD HANEL,
GARY LEE HANSEN, DONALD
LESTER BAILEY, PATRICIA ANN
ROBERTS, LYNNE M. JOHNSTON,
DEBORAH GAY HARDY, SHAWN
ROGERS, JOHN HENRY JONES,
LUCILLE L HAUGHTON,**

1

**WILLIAM JOHN KASUN, KEVIN DEAN HAYWORTH, KAREN LEE BAKER, ROBERT L SANDSTROM, RONALD JAY NELSON, STEVEN FRANK HEGAR, PAUL EARL KELLER, KENNETH J. HERMAN, EDDIE HEATH KIMMEL, OLIVER E. KINGREY, WENDY LEE HERTZ, JAMES M. BARRY, THOMAS SCHAFER, DELORES MAE NORALEZ, MARSHA LYNNE KIRCHNER, SHERRYL ANN HESS, CHRYSTAL M POPE, ANTHONY JOSEPH BATTELLO, VICKIE LYNN HEUSCHER, DARCY L. KOHLES, SHIRLEY M SCHLIEP, MARLENE SHARKEY, CHARLES THOMAS KOPP, BEVERLY J HICKS, KERWIN NICK KOSTELECKY, SUSAN RAE HIGHTOWER, IRIS M.  LAFFOON, DUANE ARTHUR HOVLAND, KATHY I. OLSON, BARBARA A. ORR, RODNEY LEE HUNT, DALE P. JACOBS, MARILYNNE K LAFLEY, WILLIAM F. JASZKOWIAK, DONALD RAY LARSON, GERTRUDE JEAN PULST, ISABELLA MARGARET PAGE, TIMOTHY WATSON PAGE, DONNA J LAWSON, DENISE  JOHNSON, ROBERT CLYDE BIRCH, SHARON K BLACKHALL, ANDREA JEAN BLANCHARD, GARY  BOLTON, JANICE L.  LEGRESLEY, ADITYA PAMULAPATI, DEBRA KAY SHEA, TINA L SIMS, GERALD THOMAS SISLER, DAVID LLOYD SMERKOL, CHERYL L RASMUSSEN, JERRY LEPROWSE, JOE G. PARANTEAU, THOMAS O PARKER, DANIEL V. RAU,**

## MEMORANDUM of DECISION

At Butte in said District this 2nd day of May, 2007.

Before the Court in this Adversary Proceeding are the "Plaintiff's Application for Professional Fees and Costs" filed by attorney Jon E. Doak ("Doak") on January 24, 2007, and the "Final Application for Professional Fees and Costs" filed on March 14, 2007, by attorney Steven M. Johnson ("Johnson"), who is counsel for the Defendant Trustees, Darcy M. Crum, Joseph V. Womack, Richard J. Samson, William M. Kebe, Jr., Ross P. Richardson, Gary S. Deschenes, Donald W. Torgenrud, Jr., and Robert G. Drummond.

Procedurally, this Adversary Proceeding was commenced on December 5, 2006, when the Plaintiff filed a Complaint in Interpleader. The following day, the Plaintiff filed an Amended Complaint in Interpleader. Plaintiff, Thomas E. Boland, was Class Counsel in a class action lawsuit captioned *Wombold v. Associates Fin. Services Co. of Montana, Inc. et al.*, Case No. BVD 00-888, which was filed on or about October 2, 2000, in the Montana Eighth Judicial District Court, Cascade County (hereinafter, "the Wombold Class Action"). Defendants Darcy M. Crum, Joseph V. Womack, Richard J. Samson, Ross P. Richardson, William M. Kebe, Jr., Gary S. Deschenes, and Donald W. Torgenrud, Jr. are each Chapter 7 Panel Trustees in the District of Montana; and Defendant Robert G. Drummond is the Standing Chapter 13 Trustee for the District. Such Defendants, hereinafter referenced collectively as "the Trustees", are the Trustees in certain Chapter 7 and Chapter 13 bankruptcy cases filed in the District of Montana.

### BACKGROUND

The Debtor/Defendants, Daniel Edward Brown and Shirley Ann Brown ("Brown"), are individuals who have previously filed a Chapter 7 bankruptcy proceeding in the District of

3

Montana, and are also Plaintiff class members in the Wombold Class Action.  Those individuals listed on Exhibit A, attached to the Plaintiff's Amended Complaint in Interpleader, had each, prior to January 1, 2006, filed a Chapter 7 or Chapter 13 bankruptcy proceeding in the Bankruptcy Court for the District of Montana, were also Plaintiff class members in the Wombold Class Action, and were thus persons similarly situated with the Brown Defendants. Such persons (including the Browns) are hereinafter referenced collectively as "the Debtors."

In October of 2000, James R. and Elizabeth Ann Wombold filed an action in the Montana Eighth Judicial District Court challenging Associates' policies and practices in marketing and making consumer loans in Montana.  On or about September 25, 2002, the state district court certified the Wombolds' case as a class action to include all persons to whom Associates made a loan which was originated in the State of Montana during the time frame of January 1, 1995, through December 31, 2000.

The state district court granted the class action plaintiffs' motion for partial summary judgment on October 27, 2003, finding that Associates had violated the Montana Consumer Loan Act ("MCLA") [§§ 32-5-101 to -506], with respect to all second mortgage loans from January 1, 1995, through December 31, 2000, and those first mortgage loans made by Associates to Sub-Class members from January 1, 1995, through October 1, 1997.  Associates appealed the judgment of the state district court to the Montana Supreme Court.  In a decision entered on December 30, 2004, the Montana Supreme Court affirmed the district court's summary judgment ruling and remanded the case for a determination of the proper remedy to be afforded the real estate Sub-Class members for Associates' violation of the MCLA.  *See Wombold v. Associates Fin. Services Co. of Montana, Inc.*, 2004 MT 397, 325 Mont. 290, 104 P.3d 1080 ("Wombold

Appeal").

In the Wombold Appeal, the Supreme Court first found that the Wombolds, and the other class plaintiffs, had a limited private right of action to bring suit under the MCLA. The Supreme Court then turned its focus on whether Associates had violated the MCLA. To resolve this second issue, the Supreme Court had to first determine whether the fees and other charges assessed by Associates against the class action plaintiffs were interest or other costs. As noted by the Court, Associates imposed a charge on thousands of Montana loans, which charges were referred to as "points":

> The amount of the loan was advanced to the borrower, and Associates kept the points. The points were added to the amount owed, and thus the principal balance of the loan, upon which interest was charged, became the sum of both the points and the amount advanced, and the borrower paid simple interest on this amount. If the loan was paid early, or defaulted, there was no refund of the points that had been added up front.

*Wombold*, 2004 MT 397, at ¶ 26. If the so-called "points" were interest, no violation of the MCLA would arise because Associates, as a regulated lender, was allowed to charge any rate of interest that the market would bear. *Wombold*, at ¶ 50. However, the Court went on to find that the points were not interest, but rather, were a fee charged by Associates for making the loan. *Wombold*, at ¶ 59:

> We conclude that the points charged on the loans in question are not interest; that is, they are not charged for the use, forbearance, or detention of money. Under the circumstances of this case and the provisions of the CLA, the imposition of a flat fee, computed as a percentage of the loan, bearing no direct relation to actual costs of specific services performed, front-loaded into the loan, which did not constitute a charge for the use of the lender's money over time, is not interest. These points are a fee charged by Associates for making the loan. By the express language of the CLA, Associates was prohibited from charging fees not explicitly authorized under the act, § 32-5-103(1), MCA; § 32-5-301(5), MCA. Charging the fee described, which we have called points, violates the CLA

5

despite Associates' clever attempt to disguise such charge as interest. *Wombold*, 2004 MT at ¶ 59.  Based upon the foregoing, the Supreme Court held that the points were unauthorized fees prohibited under the MCLA.  *Wombold*, at ¶ 59.  The Supreme Court noted that because the points were "fees" and not "interest", Associates was exempt from a MCLA provision requiring a refund upon prepayment. *Wombold*, at ¶ 63.  Rather, the loans were "interest-bearing loans, [which] by their very nature, do not require a refund of interest because, until it is earned, interest is neither charged nor collected." *Wombold*, at ¶ 63.[1]  The Supreme Court declined to reach the issue of remedies under the MCLA, and did not reach Wombold's assertion that the loans should be declared void.  *Wombold*, at ¶¶ 64-67.

Upon remand to the state district court, the Wombold action was settled for $25 million and, after expenses and fees, net settlement proceeds were distributed, with court approval, to four groups of plaintiffs, with the largest share of the settlement going to real-estate secured loans governed by the MCLA on which points were paid (that is, on the subclass that was the subject of the Supreme Court's decision).  The groups and their allotted distribution are summarized as follows:

**Group 1**, $16.5 million, MCLA real estate-secured loans on which points were paid;

**Group 2**, $1 million,  non-MCLA real-estate secured loans on which points were paid;

**Group 3**, $ 250,000, real-estate secured loans on which no points were paid;

---

[1] Justice Rice, concurring specially, agreed that Associates had violated the MCLA. However, Justice Rice believed that the fees and charges referred to as "points" were permissible interest.  Justice Rice reiterated the differences between "interest-bearing" loans and "add-on" loans and concluded that Associates was "bound by the provisions of the Act which apply to 'add-on' loans, including the necessity of refunding the appropriate portions of those assessments when the loan was paid off or otherwise re-financed." *Wombold*, at ¶ 76.

**Group 4,** $ 1 million, loans not secured by real estate.

In a Notice of Proposed Class Action Settlement, the court noted:

> This action alleges that Associates engaged in improper practices in marketing and making consumer loans, primarily by selling unwanted credit insurance [packing] and by refinancing loans [flipping] to increase its fee income without benefit to borrowers.  The action includes claims for fraud and misrepresentation on behalf of all Class Members.  On behalf of certain borrowers whose loans were secured by real estate and who paid Associates "loan origination fees" or "points," the action includes a claim for violation of the Montana Consumer Loan Act. ...

The court further stated:

> Class Counsel believe that the plan of distribution described in Section 5 fairly distributes the Settlement Fund according to the strength of the claims against Associates.  Most of the Settlement Fund is allocated to Group 1 loans because only with respect to those loans is there a potentially viable claim that the loans are void or that Associates should pay the borrowers twice the "loan origination fees" or "points" they paid based on the violation of the MCLA found by the district court and affirmed by the Montana Supreme Court.  With respect to Group 2 loans, Class Members have claims for both wrongfully refinancing and improper sale of credit insurance; whereas, with respect to Group 3 and 4 loans, there is only a claim for improper sale of credit insurance. Much less is likely to be recovered on those claims, even if successful, than on the claim for violations of the MCLA, if eventually successful.

Thus, all claims were settled on the basis of events occurring as of the time of closing – illegal points, wrongful refinancing, and improper sale of credit insurance.  The settlement, however, did not affect the terms of any loan agreement whose term had not expired, and those class members remained obligated to pay their loans.

Administrative decisions were necessary to divide the funds among individual plaintiffs.  The money was allocated among Group 1 and 2 members based on a formula that took into account the total amounts of interest and "loan origination fees" or "points" paid on the loans.  Settlement amounts for Groups 3 and 4 were divided equally among the loans on a "per loan

basis." These allocations were purely administrative; plaintiffs in some groups shared the funds equally, and plaintiffs in other groups were assigned a share based on points and interest paid. But the $25 million settlement was a lump-sum, and the court approved the distribution among the four Groups based on events occurring at or before the time the loans closed.

Associates paid the agreed-upon settlement monies into the Wombold Settlement Fund. As Class Counsel, the Interpleader Plaintiff herein, Thomas E. Boland, was responsible for distributing funds from the Wombold Settlement Fund in accordance with the plan of distribution approved by, and subject to the continuing supervision of, the Montana Eighth Judicial District Court. Each of the Debtors was a beneficiary of part of the settlement of the Wombold Class Action. Collectively, as of December 14, 2006, the Debtors' shares of the funds in the Wombold Settlement Fund totaled $1,951,247.00; which aggregate sum included $1,878,876.00 in principal settlement amounts attributable to the claims of such Debtors, plus interest in the amount of $72,371.00 accrued through December 14, 2006, on those settlement amounts.

With respect to the bankruptcy cases impacted by the Wombold Class Action settlement, Plaintiff was employed as special counsel in a handful of bankruptcy cases in January of 2006 to, according to at least one application, "pursue a class action lawsuit wherein the Debtors are parties." *See In re Carroll*, Case No. 04-62088, docket entry number 9. The Court subsequently learned in approximately July of 2006, after two Defendant/Trustee's had received from the Plaintiff settlement monies totaling roughly $171,782.20, that the Wombold matter had settled. Upon learning of the settlement, the Court advised the Trustees that it expected that the funds would be collected and disbursed as quickly as possible.

8

Through calculations that are not part of the record, Plaintiff earmarked the settlement monies payable to the Debtors as either "pre-petition" or "post-petition" and allegedly agreed to remit the "pre-petition" settlement monies to the Trustees, but maintained that the settlement monies designated "post-petition" should go to the Debtors.  The Court understands that the Plaintiff and Trustees were always in agreement that the Trustees were entitled to the so-called "pre-petition" portion of the settlement monies and early on, it also appears that the Trustees were willing to concede that the settlement monies designated as "post-petition" would be paid to the Debtors.  However, somewhere along the line, the Trustees had a change of heart and decided to pursue the post-petition portion of the settlement monies.  According to Doak, Plaintiff was hesitant to turn all the settlement monies over to the Trustees because numerous Debtors had contacted Plaintiff threatening to sue him if he turned the monies over to the Trustees.

The events that transpired after the dispute arose between Plaintiff and the Trustees are less clear, and Doak and Johnson provide different interpretations of such events.  What the Court discerns from the skeletal facts is that the Trustees were not necessarily in agreement among themselves as to whether they should pursue the post-petition settlement monies.  However, the decision was eventually made that the Trustees would pursue such funds.  Rather than deal with the matter on their own, the Trustees agreed that they would hire Johnson to pursue the post-petition settlement monies.  The Trustees thus began filing, in late October of 2006, applications in the individual bankruptcy cases seeking authority to employ Johnson under 11 U.S.C. § 327(a) to represent the bankruptcy estates "in an action for turnover of <u>all</u> of the post-petition settlement funds due and owing to" the Debtors.  *See, e.g., In re Hall*, Case Number 99-40381, docket entry number 23.  In all, the Trustees sought to employ Johnson in 80 of the 154, or so, involved

9

bankruptcies.[2]

Starting in August of 2006, but primarily in November of 2006, four of the Trustees, Deschenes, Crum, Womack and Kebe, were simultaneously seeking to employ themselves in approximately sixty-two of the individual bankruptcy cases as special counsel to recover and administer the Wombold settlement monies.[3]  According to this Court's calculation, the Trustees employed both themselves and Johnson in 35 of the bankruptcies.  Also, the Plaintiff was employed by the Trustees as special counsel in 6 of the affected bankruptcies.[4]  The Court granted requests for turnover in 36 cases where neither the Trustee nor Johnson were employed.

The Court approved Johnson's employment in six (6) bankruptcy proceedings on October 24, 2006.  However, when additional applications to employ Johnson began flooding in after that date, the Court became concerned over the number of applications to employ that were being filed, and in particular, was concerned that the Wombold Class Action settlement had created a feeding frenzy among the attorneys.  The Court thus set 17 of the Trustees' requests to employ Johnson for hearing in Great Falls, Montana on November 15, 2006.  Following the November 15, 2006, hearing, the Court entered 17 separate hearing Orders that provide, generally, as follows:

> Attorney Steve Johnson of Church, Harris, Johnson & Williams, P.C., appeared at the hearing and advised the Court that the applicant recognizes this Court's discretion to review the reasonableness of any requested contingency fee under 11 U.S.C. § 330 and 11 U.S.C. § 328(a).

---

[2]  Exhibit A to Johnson's Final Application for Fees and Costs reflects that Johnson spent 22 hours at a rate of $250.00, or $5,500.00, researching whether he had conflicts of interest in any of the cases and working on the preparation of employment applications.

[3]  Trustee Torgenrud employed himself as special counsel in one individual bankruptcy case.

[4]  Johnson was employed in four of the six cases in which the Plaintiff was also employed.

10

Based on that understanding and the representations of counsel, and the Court having expressed to counsel on the record its concerns about the magnitude and fairness of another contingency fee applied against class action proceeds, and the effect of such contingency fee on the debtors and creditors, the Court granted the Trustee's Application to approve employment of the law firm of Church, Harris, Johnson & Williams, P.C., at the hearing, with any and all contingency fees which may be requested by Church, Harris, Johnson & Williams, P.C., subject to this Court's review and discretion upon the filing of applications for compensation, notwithstanding the provisions of the Trustee's Application allowing a contingency fee.

**IT IS ORDERED** the Debtor's objection is overruled; the Trustee's Application to approve employment of the law firm of Church, Harris, Johnson & Williams, P.C., filed November 7, 2006, is granted; and the employment by the estate of the law firm of Church, Harris, Johnson & Williams, P.C., to represent the Trustee and estate in litigation described in the Trustee's Application is approved; **PROVIDED, HOWEVER**, that all compensation sought by the law firm of Church, Harris, Johnson & Williams, P.C., in this case is subject to review and approval by this Court, including possible reduction in allowance of fees notwithstanding the provisions of the Trustee's Application allowing a contingency fee.

Johnson's employment in all the other bankruptcies impacted by the Wombold Class Action settlement was done by Orders that contained language substantially similar to the language set forth above.

The Trustees, Johnson and the Plaintiff apparently discussed the possibility of resolving their disagreement as to who was entitled to the post-petition funds. When the parties were unable to resolve that matter, they then agreed that the Plaintiff would file an interpleader action and let this Court determine who was entitled to the funds. When the interpleader action was not forthcoming in a timely fashion, the Trustees flooded the Court with motions for turnover on November 16, 2006, and November 17, 2006, in an effort to bring the matter before the Court. The motions filed in November of 2006 prompted the Plaintiff to finally file his Complaint in Interpleader on December 5, 2006.

As mentioned above, the parties agreed that the appropriate allocation and distribution of

the Wombold Settlement Funds attributable to the Debtors was a matter that should be determined by this Court.  The matter finally came before the Court when the Chapter 7 Trustees, through counsel, filed on January 29, 2007, a "Motion for Summary Judgment and Interpleader Award of Entire Wombold Settlement Proceeds to Bankruptcy Estates."  At a hearing held January 30, 2007, the Court heard statements regarding the Motion for Summary Judgment from attorney Steven Johnson, who appeared on behalf of the Trustees.  The Court also heard comments from attorneys James A. Patten (attorney for the Defendant-Debtors, Daniel Edward and Shirley Ann Brown, William Jaszkowiak, Darlene Durand, Thomas Smith, Keith and Tina Sims, Darcy L. and Colleen D. Kohles, Thomas and Pana Schafer, Darlene Hall, Olga Lunde, Robert C. and Teresa A. Stene, Charles T. and Hilda Kopp and Dale L. and Claudia J. Wheeler), R. Clifton Caughron and Randy Winner.  The Court also heard testimony from Leonard and Carole Wortman, Christopher and Debra Shea and Richard Stevens, all *pro se* Defendant-Debtors.

The parties at the January 30, 2007, hearing agreed that disposition of the Motion for Summary Judgment would resolve all issues raised in Plaintiffs Interpleader Complaint and would similarly govern all motions for turnover filed by the Chapter 7 Trustees in various Chapter 7 bankruptcy cases.[5]

To further facilitate matters, the Trustees and the Plaintiff entered into a Stipulation that was filed with the Court on January 25, 2007.  The Stipulation resolved various pending issues between the Defendant/Trustees and the Plaintiff. The Stipulation was intended to streamline the

---

[5]  According to the Chapter 13 Trustee, all turnover motions in the Chapter 13 cases have been resolved by stipulation.

case procedurally and enable the Court to move more quickly to a decision on the merits of the competing claims of the Debtors and the Defendant/Trustees to the interpleaded funds at issue in this action. By Order entered January 26, 2007, the Court approved all provisions of the Stipulation, except for paragraph 2D dealing with the fees and costs in the sum of $17,011.07 requested by Plaintiff's counsel. The provision not approved awarded "Plaintiff the reasonable attorney fees and costs incurred in preparing and filing this action, and the costs incurred in preparing an accounting of the settlement proceeds to be interpleaded, and any other costs allowed by law, in the aggregate amount of fees and costs of $17,011.07 set forth in the fee application filed by Plaintiff's counsel Jon Doak (Doak and Associates, P.C.) on January 24, 2007."

In the interim, the Chapter 13 Trustee, Robert G. Drummond, filed an "Amended Chapter 13 Trustee's Motion to Dismiss Chapter 13 Defendants" on February 13, 2007, requesting that the following Debtors be dismissed from this Adversary Proceeding on the basis that Mr. Drummond, as Trustee, had determined that the settlement funds were insufficient to justify reopening the bankruptcy, administering the funds, and filing a new final report:[6]

       04-63141 Herbert Blazier
       02-40566 Dan S. Carlson
       99-42860 Matthew J. Foster
       04-63056 Trina Garza
       02-41685 Sandra Gregory
       95-52032 Edna Hagen
       00-43122 David A. Hayter
       02-41977 Keith Johnson
       99-51538 David Muniz
       00-51139 Robert Murphy
       05-62073 Rockne Osterhoudt

---

    [6] Interestingly, none of the identified debtors were listed as defendants on Exhibit A to the Amended Complaint in Interpleader.

13

    99-20279 Donna Roark
    02-60316 Jayleen Salter
    98-11260 Revalie Salyers
    02-40557 Jill Southard
    98-42992 Vickie Stanley
    01-32797 John S. Stordahl
    02-41446 Annette Toole
    00-41929 Jeffrey Wohler
    02-60768 Jim L. Yager

Mr. Drummond also requested in his Motion that the following Chapter 13 Debtors be dismissed

from this Adversary Proceeding on the basis that stipulations had been filed with the Bankruptcy

Court directing either Class Counsel or the Clerk of the Bankruptcy Court to pay funds to the

Debtors and/or the Trustee, pursuant to Stipulations approved by the Court[7]:

    02-60359 Dwight Agrimson
    98-41594 Cora A. Bonney
    05-60671 Lori Engen
    01-41698 William C. Farrell
    02-30426 Richard J. Gray
    98-10076 Edward R. Hampton
    01-32126 Susan A. Hightower
    02-10670 Bonnie L. Marak
    03-63224 Tammie S. Marquardt
    00-42117 Robert M. Medina
    96-42154 Jack H. Merritt
    04-60316 Judy A. Miller
    01-40789 Barbara Orr
    03-60184 John M. Pritzl
    98-12096 Paul Raynock
    05-61535 Lloyd G. Sampson
    00-42163 Marie C. Thomas
    98-11114 Gerald J. Weidner
    98-32924 Teresa R. Zaharko

Mr. Drummond's February 13, 2007, Motion was, after notice of an opportunity to respond,

---

[7] Of this group of Chapter 13 debtors, only Bonney, Hampton, Hightower, Medina, Merritt, Orr and Weidner were identified as defendants on Exhibit A attached to the Amended Complaint in Interpleader.

14

granted by Order entered February 27, 2007.  Consequently, Mr. Drummond and the Chapter 13

Debtors listed above were dismissed from this Adversary Proceeding.

Thereafter, the Court entered a Memorandum of Decision on March 5, 2007, granting the

Trustee's Motion for Summary Judgment concluding that:

> [T]he claims at issue accrued prior to the Defendant/Debtors' bankruptcy petition
> dates.  Accordingly, the individual causes of action should have been listed in the
> Defendant/Debtors' schedules.  Other than the Johnsons, the causes of action
> against Associates were not listed in the Debtor/Defendants' bankruptcy schedules
> and the Trustees are not deemed to have abandoned assets that were neither listed
> nor disclosed.  Finally, because the settlement was in exchange for the release of the
> Class Members' claims against Associates, which claims gave rise to a cause of
> action prepetition, the Court finds that the funds held by the Clerk of the Court in
> the account at First Interstate Bank must be distributed to the Chapter 7 Trustees,
> who will then disburse the proceeds in accordance with the Bankruptcy Code and
> Rules.

Following entry of the Memorandum of Decision and Order on March 5, 2007, Johnson

proceeded to file his Final Application for Professional Fees and Costs on March 14, 2007.

Thus, the two matters left pending in this Adversary Proceeding are the fee application filed by

Plaintiff's counsel Jon Doak (Doak and Associates, P.C.) on January 24, 2007, and the Final

Application for Professional Fees and Costs filed by Johnson on March 14, 2007.

As set forth in paragraph 2D of the Stipulation between the Trustees and the Plaintiff,

filed January 25, 2007, the Trustees agree that the Plaintiff may be awarded "the reasonable

attorney fees and costs incurred in preparing and filing this action, and the costs incurred in

preparing an accounting of the settlement proceeds to be interpleaded, and any other costs

allowed by law, in the aggregate amount of fees and costs of $17,011.07 set forth in the fee

application filed by Plaintiff's counsel Jon Doak (Doak and Associates, P.C.) on January 24,

2007."  The Court has received objections to both Doak's and Johnson's fee requests from

Marsha Lynn Kirchner and Richard Stevens.

### DISCUSSION

Plaintiff's counsel and Johnson are both fully aware, or should be fully aware, that this Court has an independent obligation to review all fee applications to evaluate the propriety of the compensation requested.  *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 841 (3rd Cir. 1994); *In re Wildman*, 72 B.R. 700, 701 (Bankr. N.D.Ill. 1987).  In *Busy Beaver*, the court explained:

> [T]he integrity of the bankruptcy system ... is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications *sua sponte*.  The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law....  Nothing better serves to allay [public perceptions that high professional fees unduly drive up bankruptcy costs] than the recognition that a bankruptcy judge, before a fee application is approved, is obliged to [review it carefully] and find it personally acceptable, irrespective of the (always welcomed) observation of the [United States trustee] or other interested parties.

*Id.* (*quoting In re Evans*, 153 B.R. 960, 968 (Bankr. E.D.Pa 1993)).

Johnson seeks "approval of an award of fees in the amount of $212,517.55, equal to 10% of the amounts of the interpleaded Wombold settlement funds awarded to the Trustees, and costs in the amount of $2,578.21."  Although Johnson seeks a contingency fee award, Johnson also spends considerable time in his brief arguing that he should be awarded a bonus over the lodestar approach.  According to Johnson, "[f]ailure to grant a bonus over the lodestar approach to any attorney who successfully achieves a good result for insolvent bankruptcy estates based upon the promise of a contingency fee, will have a chilling effect on the ability of trustees to obtain representation for insolvent bankruptcy estates."  Under the lodestar approach, Johnson's fees and costs equal $80,413.21.

Johnson's request for a contingency fee award in this case is troubling in many respects. First, the total funds interpleaded into the Court's registry totaled $1,951,247.00, and not

16

$2,125,175.47, as asserted by Johnson.  Second, many of the cases involved in this Adversary Proceeding were opened and closed years ago.  As a consequence, even though claims bar dates have been set in virtually every Chapter 7 case involved, many cases are so old that creditors simply are not filing proofs of claim.  For instance, in *In re Arensmeyer*, Case Number 97-11130, Johnson sought and obtained the turnover of funds totaling $25,385.44.  However, only three proofs of claim totaling $4,426.90 have been filed in that case to date, and the claims bar date expired on February 7, 2007.  To grant Johnson a contingency fee award on monies that may ultimately be paid to the Debtors smacks of inequity because the Debtors are the very persons opposing Johnson's efforts.[8]

The Court's concern with Johnson's request for a contingency fee award does not end here. Johnson's contingency fee request is based, in part, upon amounts paid to the Chapter 13 Trustee and Chapter 13 Debtors pursuant to Stipulations.  Specifically, in *In re Bonney*, Case No. 98-41594; *In re Hampton*, Case No. 98-10076; *In re Hightower*, Case No. 01-32126; *In re Medina*, Case No. 00-42117; *In re Merritt*, Case No. 96-42154; *In re Orr*, Case No. 01-40789; and *In re Weidner*, Case No. 98-11114, the Trustee received $14,923.56, $26,746.00, $2,417.46, $3,600.06, $4,310.59, $26,210.45, and $11,478.16 respectively, while the respective Chapter 13 Debtors received $4,974.52, $8,915.33, $805.82, $1,200.01, $1,436.87, $27,005.06, $589.49. Upon motion of the Chapter 13 Trustee filed February 13, 2007, the Chapter 13 Trustee and the

---

[8] As another example, *In re Laffoon*, Case Number 96-51194, was filed on June 5, 1996, the Debtor's discharge was entered on September 16, 1996, and the case was closed on September 24, 1996.  The Chapter 7 Trustee in *Laffoon* moved to reopen the case on October 9, 2006, and the case was indeed reopened on October 10, 2006.  A claims bar date of January 11, 2007, was subsequently set by the Court.  Although the Trustee was granted the turnover of funds totaling $7,212.70, not a single creditor has filed a proof of claim.

above-referenced Chapter 13 Debtors were, by Order entered February 27, 2007, dismissed from this Interpleader action. Given the dismissal of the above parties from this action, the Court concludes that the calculation of any contingency fee request on the above amounts, totaling $134,613.38, is not appropriate.

Finally, the Court is of the understanding that the Trustees and the Plaintiff were in agreement long before Johnson's involvement in this case that the bankruptcy estates were clearly entitled to the so-called "pre-petition" settlement monies. Johnson was retained for the sole purpose of pursuing the "post-petition" settlement monies.[9] Nothing in the record reflects the amount of settlement monies that were designated by the Plaintiff as "pre-petition" or "post-petition" settlement monies. However, in a number of cases, the Trustees appear to have filed motions for turnover seeking the "pre-petition" portion of the settlement monies while Johnson filed a separate motion seeking the post-petition portion of the settlement monies. For instance, in *In re Blackhall*, Case Number 03-60248, Trustee Deschenes filed a motion for turnover on November 16, 2006, seeking the turnover of funds in the sum of $10,651.93 while Johnson filed a motion for turnover on November 17, 2006, seeking the turnover of additional funds in the sum of $4,755.16. In all, Johnson filed motions seeking the turnover of funds totaling $1,010.222.50. Of the aforementioned amount, Johnson obtained orders granting the turnover of funds totaling

---

[9] Exhibit A to Johnson's Final Application for Fees and Costs supports this conclusion. For example, on November 16, 2006, Johnson logs the following entry: "Two telephone conferences with Trustee Deschenes re: Timing filing so-called 'postpetition' turnover motions." Another entry on November 29, 2006, also logged by Johnson, provides: "Preparation of amended turnover motions per telephone conference with Trustee Womack to seek only 'postpetition' amounts."

$941,728.41.[10]  A 10% contingency fee on amounts successfully ordered turned over would equate to $94,172.84, an amount substantially less than the amount requested by Johnson of $212,517.55.

As the foregoing discussion illustrates, a contingency fee award in this case simply does not work and indeed, Johnson admitted at the hearing on approval of his fee request that the Court's analysis was governed by 11 U.S.C. § 330.  Johnson also apparently anticipated the shortcomings of this contingency fee request as Johnson has provided the Court with adequate information and detail for this Court to examine Johnson's fee request under the lodestar approach.

Under the lodestar approach, extensive case law has developed regarding the amount and type of information that applicants must include in their applications.  The case of *In re WRB-West Associates*, 9 Mont. B.R. 17, 18-20 (Bankr. Mont. 1990) summarizes thus:

> Pursuant to 11 U.S.C. §§ 327-330 and Bankruptcy Rules 2016 and 2017, this Court has an independent judicial responsibility to evaluate fees requested from the estate.  *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 831 (Bankr. Vt. 1987); *In re Seneca Oil Co.*, 65 B.R. 902 (Bankr. W.D. Okla. 1986); *In re Frontier Airlines, Inc.*, 74 B.R. 973 (Bankr. Colo. 1987).  The burden of proof to show entitlement to all fees requested from the estate is on the applicant.  *In re Lindberg Products, Inc.*, 50 B.R. 220, 221 (Bankr. N.D. Ill. 1985).  This burden is not to be taken lightly, especially given the fact that every dollar expended on fees results in a dollar less for distribution to creditors of the estate.  *In re Yankton College*, 101 B.R. 151, 158 (Bankr. S.D. 1989); *In re Pettibone Corp.*, 74 B.R.

_____

[10]  The difference between the amounts requested of $1,010,222.50 and the amounts awarded of $941,728.41 is generally attributable to instances where the Trustees sought and obtained turnover of the settlement funds prior to Johnson's involvement in the case.  For example, in the case in *In re Flynn*, Case Number 02-60200, Trustee Kebe received funds totaling $35,122.48 from the Plaintiff in July of 2006.  Johnson proceeded to file a motion for turnover on November 21, 2006, seeking the turnover of funds in the amount of $35,126.73.  Because the Trustee had previously received $35,122.48, Johnson's motion for turnover only resulted in the turnover of funds totaling $4.25.

293, 305 (Bankr. N.D. Ill. 1987).  All expenses and fees must be shown as both actual and necessary under § [330(a)(3)] of the Code.  *S.T.N.*, 70 B.R. at 834; *Yankton College*, 101 B.R. at 158; *Seneca Oil*, 65 B.R. at 912.  Moreover, *In re Convent Guardian Corp.*, 103 B.R. 937, 939-940 (Bankr. N.D. Ill. 1989) holds:

> Bankruptcy Rule 2016 provides that "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." (emphasis added)  The Application should contain a detailed list of expenses including the date, the type and the amount.  Expenses must be actual not estimates.  *In re Wildman*, 72 B.R. 700-731 (Bankr. N.D. Ill. 1987); *In re Marsh*, 14 B.R. 615, 617 (Bankr. E.D. Va. 1981).  An expense is necessary if it is incurred because it was reasonably needed to accomplish the proper representation of the client.  *Wildman*, 72 B.R. at 731.

The above excerpt demonstrates that this Court is obligated to review each request for fees and costs to insure that applicants provide:

1. a description of the services provided, setting forth, at a minimum, the parties involved and the nature and purpose of each task;
2. the date each service was provided;
3. the amount of time spent performing each task; and
4. the amount of fees requested for performing each task.

As explained by the Ninth Circuit Court of Appeals: "The detailed fee applications enable the bankruptcy court to fulfill its obligation to examine carefully the requested compensation in order to ensure that the claimed expenses are justified."  *In re Nucorp Energy, Inc.*, 764 F.2d 655, 658 (9th Cir. 1985).

Under the lodestar approach, Johnson's fees and costs equal $80,413.21.   First, the Court

takes no issue with Johnson's request for reimbursement of costs in the amount of $2,578.21. Second, although the amount requested by Johnson for interpleader litigation ($31,259.50) seems excessive, this Court is reluctant to substitute its judgment for that of Johnson on issues involving litigation tactics.  Likewise, Johnson also requests fees of $21,125.00 for legal research and analysis.  The fees requested for legal research and analysis, like Johnson's interpleader litigation fees, seem excessive, particularly when the research increases Johnson's overall knowledge base.  *See In re Bob' s Supermarket*, 10 Mont.B.R. 240, 243 (Bankr. Mont. 1992). However, because the issues involved in this case were complex and unique, the Court will allow Johnson's request for fees of $21,125.00 associated with legal research.

 Johnson next requests fees of $11,185.00 for services generally defined as "turnover litigation."  The entries under the above heading generally pertain to the preparation of turnover motions and the filing of the same with the Court.  While the preparation and filing of turnover motions would generally seem to fall with the realm of trustee duties, the Court acknowledges that Johnson is not subject to the limiting language found at 11 U.S.C. § 328(b).

The Court is also concerned that Johnson requests fees and costs of $5,842.39 for fees and costs incurred prior to October 24, 2006, the date that Johnson was first employed in any of the bankruptcy cases at issue.  Johnson is an extremely experienced bankruptcy attorney who should fully appreciate the fact that the Court must approve his employment before he may start billing for fees and costs.

Additionally, many of the entries on Exhibit A appear to be lumped.  For example, on November 14, 2006, Johnson spent 9.10 hours, at a rate of $250.00, on "review of status of getting employed by trustees in Chapter 7 estates; review of orders/notices setting hearings on

21

trustee's applications; exchange of emails with Trustee Samson re: turnover motions and re:

meetings with Bolands' office; telephone conferences with Trustees Deschenes and Samson re:

hearings of employment applications and telephone conference with AUST Neal Jensen re: same

and re: meeting with attorney Boland's office; preparation for 11/15/06 hearings in Trustee

Deschenes cases."  This Court has historically held that when lumping makes it impossible for

the Court to allocate time to each activity or to each attorney, the Court may disallow all the

hours which were lumped together:

> The "lodestar method, multiplying a reasonable number of hours by a reasonable
> hourly rate, is the primary but not exclusive method of calculating fees.
> *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc. (Puget Sound)*,
> 924 F.2d 955, 960 (9th Cir. 1991).  In *Puget Sound*, the Ninth Circuit affirmed an
> award based on an alternative formula based on a percentage of what the applicant
> recovered for the estate instead of the "lodestar" method. Id. at 961.  The Ninth
> Circuit stated:
>
> > Indeed, the bankruptcy court found that Uziel's application was
> > difficult to interpret.  "Because the application contains numerous
> > entries which lump together services relating to varying matters,
> > the court is unable to delineate the specific times spent on specific
> > tasks."  While Uziel submitted a comprehensive statement, it is
> > difficult to sort out the work performed on the three categories for
> > which he seeks compensation.  Uziel thus failed to supply the
> > bankruptcy court with a sufficiently detailed application.
>
> *Id*. at 960.  Having found that the fee application was inadequate and failed the
> "actual and necessary" prong of 11 U.S.C. § 330, the bankruptcy court in *Puget
> Sound* based its award on the amount that the applicant recovered for the estate.
> Id. at 961.

*In re Brown*, 10 Mont. B.R. 309, 313-314 (Bankr. D. Mont. 1992).

Finally, the Court does not look favorably on fee applications that bill more than once for

interoffice activities.  As an illustration, Jeannie Young of Johnson's office bills $600.00 on

December 14, 2006, to "review recent emails from trustees and Steve Johnson re file; office

conference Jeannie Young & Steve Johnson re research needed re class action and facts

necessary under the law; review and comparison of original and amended complaint in

interpleader and motion for class certification; begin legal research re class certification."  On

that same date, Johnson bills $350.00 for "conference with Ms. Young and analysis of litigation

and settlement strategy in interpleader action, re: recommendations to trustees re: same, and re:

agenda for schedule telephone conference with trustees."

> Rather than continue with more concerns regarding Johnson's fee request, the Court

exercises its judicial discretion to allow Johnson's fee request, as determined under the lodestar

method, but denies Johnson's request for a fee enhancement.  The leading case in the Ninth

Circuit regarding attorneys fee enhancement in bankruptcy cases is *Burgess v. Klenske (In re*

*Manoa Finance Co., Inc.)*, 853 F.2d 687 (9th Cir. 1988).  In *Manoa*, the Court stated:

> A compensation award based on a reasonable hourly rate multiplied by the
> number of hours actually and reasonably expended is presumptively a reasonable
> fee.  *See Clark v. Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986).  In addition, the
> following four *Kerr* factors are now considered subsumed within the lodestar and
> cannot serve as independent bases for an upward adjustment: (1) the novelty and
> complexity of the issues, (2) the special skill and experience of counsel, (3) the
> quality of representation, and (4) the results obtained.  *Delaware I*, 478 U.S. at
> 565, 106 S.Ct. at 3098; *Miller v. Los Angeles County Bd. Of Educ.*, 827 F.2d 617,
> 620-21 n. 4 (9th Cir. 1987).  Because these factors ordinarily are accounted for in
> either the hourly rate or the number of hours expended, they can support an
> upward adjustment only when it is shown by specific evidence that they are not
> fully reflected in the lodestar.  *See Delaware I*, 478 U.S. at 564-69, 106 S.Ct. at
> 3098-3100; *Blum v. Stetson*, 465 U.S. 886, 898-900, 104 S.Ct. 1541, 1548-49, 79
> L.Ed.2d 891.

853 F.2d at 691.  A subsequent 9th Circuit case, *Cedic Development Co. V. Warnicke (In re Cedic*

*Development Co.)*, 219 F.3d 1115, 1117 (9th Cir. 2000), concludes a court may consider whether

the lodestar method adequately considers prevailing nonbankruptcy rates for comparably skilled

attorneys and may award an enhancement when facts establish that the hourly rate used by an attorney are inadequate.  No facts exist in the record in this case establishing that Johnson applied inadequately low hourly rates.  Johnson billed his time at $250.00 per hour.  Similarly, no evidence exists showing that such hourly rates are "bargain rates not incorporating the *Kerr* factors."  *Cedic*, 219 F.3d at 1117.  *See Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951 (1976); and *Morales v. City of San Rafael*, 96 F.3d 359, 363-64, n. 8 (identifies 12 *Kerr* factors) and 9 (9th Cir. 1996) ("Among the subsumed factors presumably taken into account in either the reasonable hours component or the reasonable rate component of the lodestar calculation [using the *Kerr* factors] are: '(1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, . . . (4) the results obtained,' (citation omitted), and (5) the contingent nature of the fee agreement.").  In accordance with the foregoing, Johnson shall be awarded fees in the sum of $77,835.00 and costs in the sum of $2,578.21.

Finally, the Court has pending before it Doak's application for fees and costs totaling $17,011.72.  Some of the fees requested by Doak appear to be outside the scope of the interpleader action.  For instance, Doak spent a fair amount of time filing objections to the Trustees' motions for turnover.  However, Doak adequately explained that the Plaintiff was forced to respond to the Trustees' motions for turnover while Doak was preparing the Complaint in Interpleader.  Doak and Johnson seem to point fingers at each other for the delay in getting this matter before the Court, but that matter is water under the bridge.  Consequently, the Court will approve not only the lodestar fees requested by Johnson, but also the lodestar fees requested by Doak.

24

The only matter of final concern to the Court is Doak's request for $1,475.00 as reimbursement for costs.  The foregoing amount is owed to Peterson and Associates, certified public accountants, for 29.5 hours spent computing interest earned on the interpleaded funds from the date the Plaintiff received the funds from Associates to the date the funds were interpleaded into the Court's account.  In preparing for distribution of the interpleaded funds, I was advised by one of my Law Clerks that she had contacted Plaintiff to obtain his interest calculations.  My Law Clerk stated that she had been advised that the calculation was done as a mere lump sum calculation.  How it could possibly take 29.5 hours to perform a lump sum interest calculation is a mystery to this Court.

Nevertheless, given the lack of any substantive objection to Doak's request for costs and given the stipulation between the Plaintiff and the Trustees filed January 25, 2007, the Court will approve paragraph 2D of the Stipulation and approve Doak's request for fees and costs in the amount of $17,011.72.  Consistent with the foregoing Memorandum of Decision, the Court will enter a separate Order providing as follows:

IT IS ORDERED that paragraph 2D of the Stipulation between the Trustees and the Plaintiff filed January 25, 2007, is APPROVED; the Plaintiff's Application for Professional Fees and Costs filed January 24, 2007, is APPROVED; and the Plaintiff's counsel, Jon E. Doak, is awarded reasonable professional fees of $11,922.50 and reimbursement of costs in the amount of $5,089.22, for a total fee and cost award of **$17,011.72**, which amount shall be paid from the interpleaded funds now held in the Court's account at First Interstate Bank.

IT IS FURTHER ORDERED that the Final Application for Professional Fees and Costs filed by attorney Steven M. Johnson on March 14, 2007, is APPROVED to the extent such fees

and costs are determined by the lodestar method; and attorney Steven M. Johnson is awarded

reasonable professional fees of $77,835.00 and reimbursement of costs in the amount of $2,578.21,

for a total fee and cost award of **$80,413.21**, which amount shall be paid from the interpleaded

funds now held in the Court's account at First Interstate Bank.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana